**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **WASHINGTON-LEE HIGH SCHOOL ALUMNI ASSOCIATION, INC.,** | |
| **Plaintiff,** | |
| **v.** | |
| **ARLINGTON COUNTY SCHOOL BOARD,** | |
| **BARBARA KANNINEN,** *in her official capacity as a member and former Chair of the Arlington County School Board*, | |
| **TANNIA TALENTO,** *in her official capacity as Chair and former Vice Chair of the Arlington County School Board*, | |
| **MONIQUE O'GRADY,** *in her official capacity as a member of the Arlington County School Board*, | Civil Action No. <u>1:20-cv-00060</u> |
| **REID GOLDSTEIN,** *in his official capacity as a member and former Chair and Vice Chair of the Arlington County School Board*, | Jury Trial Demanded |
| **NANCY VAN DOREN,** *in her official capacity as a member of the Arlington County School Board*, | |
| **CINTIA Z. JOHNSON,** *in her official capacity as Interim Superintendent of the Arlington Public Schools*, | |
| **PATRICK MURPHY,** *in his official capacity as former Superintendent of the Arlington Public Schools*, **and** | |
| **LINDA ERDOS,** *in her official capacity as former Deputy Superintendent of the Arlington Public Schools*, | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Washington-Lee High School Alumni Association, Inc. ("Alumni Association" or "Plaintiff"), by and through counsel, hereby files this Complaint against Defendants Arlington County School Board ("Board"), Barbara Kanninen, Tannia Talento, Monique O'Grady, Reid Goldstein, Nancy Van Doren, Cintia Z. Johnson, Patrick Murphy, and Linda Erdos (collectively, "Defendants"), and in support thereof state as follows:

## NATURE OF ACTION

1.      This is a case where politicians and their associates actively deceived their constituents, including the Alumni Association and its members, in order to deprive them of their opportunity to comment on changes that would greatly harm their educational reputations. Specifically, these politicians conspired to impose their own political values on the community by changing the prestigious, century-old name of Washington-Lee High School to Washington-Liberty High School, without concern for the fact that the students and alumni would no longer have the prestige of the original name.

2.      Defendants knew that the public would not support such changes, and sought to actively stymie public debate on this issue.  To that end, Defendants repeatedly and falsely promised their constituents that there would be a lengthy comment period later in the year where members of the public could weigh in on whether the school's name should be changed.  Then, instead of providing the promised comment period, Defendants suddenly and without warning made the decision to change the school's name.  Defendants made this decision at a meeting held before the promised comment period was to begin, and did not even include this issue on this meeting's publically-available agenda.  And even when a purported comment period was held on the issue of what to change the name to, Defendants actively censored and suppressed any

comments by members of the public, including the Alumni Association and its members, who took positions with which Defendants disagreed.

3.      These politicians not only violated their own policies, but also colluded to infringe the constitutional rights of their constituents, including the Alumni Association and its members, to free speech and an opportunity to be heard before depriving them of their rights.  This intentional and willful misconduct also exceeded Defendants' authority under the longstanding Dillon Rule and violated Virginia Code § 15.2-1812 *et seq.* by defacing a memorial to George Washington, Robert E. Lee, the American Civil War, the French and Indian War, the Revolutionary War, and the Mexican-American War.  *See* Va. Code §§ 15.2-1812, 15.2-1812.1, 15.2-1812.2, 18.2-137.

4.      These actions have greatly harmed the Alumni Association and its members by, among other things, causing confusion in the Alumni Association's operations, causing the Alumni Association to suffer financial loss and a decline in membership, and causing the Alumni Association's members to lose the prestige associated with the school's original name.

## PARTIES, JURISDICTION, AND VENUE

5.      Washington-Lee High School (now called Washington-Liberty High School) ("Washington-Lee" or "School") is a long-established and prestigious public high school in Arlington County that has been in operation since 1924.

6.      Washington-Lee High School Alumni Association, Inc. is a long-established private, charitable 501(c)(3) nonstock corporation that has existed for decades to aid the School. It is incorporated in Virginia and has its headquarters and principal place of business in Arlington County, Virginia.  Its purpose is to support the interests of students and alumni of Washington-Lee High School and to provide a community for said alumni.  To that end, the Alumni Association regularly solicits charitable donations for the School and organizations that benefit the School

(such as the Washington-Lee Foundation, which provides scholarships to the School's students and teachers). The Alumni Association also helps fund and organize events and activities for current Washington-Lee students. Membership-wise, the Alumni Association is a diverse organization composed of former Washington-Lee students of all races, creeds, colors, and political beliefs, united by their common bond of loyalty to their alma mater, Washington-Lee.

7. Arlington County School Board is a governmental entity headquartered in Arlington County, Virginia that has certain delimited powers over public schools in Arlington County. *See generally* Va. Code § 22.1-79.

8. Barbara Kanninen is a member of the Board, was a member of the Board at all relevant times, and was Chair of the Board from July 2017 to July 2018. Her office is located in Arlington County, Virginia.

9. Tannia Talento is the current Chair of the Board, was a member of the Board at all relevant times, was Vice Chair of the Board from July 2018 to July 2019, and is the current Chair of the Board. Her office is located in Arlington County, Virginia.

10. Monique O'Grady is the current vice Chair of the Board, and was a member of the Board at all relevant times. Her office is located in Arlington County, Virginia.

11. Reid Goldstein is a member of the Board, was a member of the Board at all relevant times, was Vice Chair of the Board from July 2017 to July 2018, and was Chair of the Board from July 2018 to July 2019. His office is located in Arlington County, Virginia.

12. Nancy Van Doren is a member of the Board, and was a member of the Board at all relevant times. Her office is located in Arlington County, Virginia.

13.     Cintia Z. Johnson is the current Interim Superintendent of Arlington Public Schools ("APS").  Her office is located in Arlington County, Virginia.  APS is the Virginia public school division encompassing Arlington County, Virginia.  *See generally* Va. Code § 22.1-25.

14.     Patrick Murphy was the Superintendent of the APS during the events complained of herein.  His office is located in Arlington County, Virginia.

15.     Linda Erdos was the Deputy Superintendent of APS during the events complained of herein.  Her office is located in Arlington County, Virginia.

16.     This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1367(a) as Plaintiff's primary claims are brought under the United States Constitution and 42 U.S.C. § 1983, and Plaintiff's additional claims involve the same case and controversy.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2) because all Defendants reside in this state and district, the memorial that is the subject of this action is located entirely within this district, and all of the events complained of occurred in this district.

## STATEMENT OF FACTS

18.     This case arises out of an attempt by Defendants to rename Washington-Lee High School to alter its memorial to President George Washington and Robert E. Lee, two notable Americans who served as generals in multiple conflicts.

19.     In making this unilateral change, Defendants willfully and purposefully deceived the public to suppress public feedback.  Defendants did so because, among other reasons, they knew that the majority of the public, including the Alumni Association, opposed changing the School's name.

20.     Specifically, throughout the 2017-18 school year, Defendants repeatedly told the public that they would consider changing their policy for naming schools via reasonable processes

that were to involve extensive community feedback.  However, on June 7, 2018, the Board broke these promises to the community by immediately and surreptitiously voting to rename Washington-Lee prior to the start of the public commentary period Defendants had promised to their constituents.  The Board did so without providing the customary public notice of the June 7, 2018 meeting, and while actively omitting the vote on whether to rename Washington-Lee from the agenda it published in advance of that meeting.  It appears that then-Chair Kanninen did this to avoid having the decision whether to rename Washington-Lee be an active issue when she ran for reelection in November 2018 and to be able to censor any public suggestions that the School's existing name be kept.

21.     Later, when Defendants finally allowed a purported period for public comment on the School's name via a Naming Committee, they severely limited the speech of members of the public, including Alumni Association and its members.   Among other abuses, Defendants prohibited any requests or suggestions that the name "Washington-Lee" be kept, claiming that the question of whether to retain that name had already been decided.  Defendants also prohibited the Alumni Association members from responding to committee members' repeated requests for information regarding how to contact Washington-Lee alumni.

22.     As a result of these actions, the Alumni Association was deprived of its ability to effectively use the name that it had a de facto license in from the School without constitutionally sufficient process and had that name disparaged as socially unacceptable.

### *The School Is Named in Memory of Washington and Lee*

23.     The School was founded in 1924 as Arlington's first comprehensive public high school.  During this first year, classes were held in makeshift classrooms because the school building was still under construction.

24.     On October 6, 1925, the new School formally opened as "Washington-Lee High School."

25.     Since that time, the School's name has remained unchanged until the events complained of herein.  Thus, this name has been in place for nearly a century.

26.     While derived from the name of Washington and Lee University in Lexington, Virginia, the name also served to honor George Washington and Robert E. Lee, who were prominent leaders from this area.

27.     George Washington first attained military distinction in the French and Indian War, and later served in the Revolutionary War.

28.     After graduating second in his class from West Point Military Academy and serving as Superintendent of that esteemed institution, Robert E. Lee first attained military distinction in the Mexican-American War, and later served on the Confederate side in the American Civil War. Prior to his death, Robert E. Lee resumed his career in education as the president of Washington College (now known as Washington and Lee University).

29.     George Washington resided in neighboring Fairfax County, Virginia.

30.     Robert E. Lee resided in what is now Arlington County.  Indeed, the county is named for his home of Arlington House, which is now part of Arlington National Cemetery.

31.     The name "Washington-Lee" served to support reconciliation between the former combatants of the American Civil War by honoring both a local Federal general and a local Confederate general.  This is consistent with the behavior of both George Washington, who strongly supported a national unity that transcended factionalism, and Robert E. Lee, who after the American Civil War worked to encourage former Confederates to reconcile with the North and abandon any sort of "Lost Cause" attempts to continue fighting the war.

32.     For example, upon his appointment as president of Washington College in 1865, Robert E. Lee stated: "I think it the duty of every citizen in the present condition of the Country, to do all in his power to aid in the restoration of peace and harmony."

33.     Other attributes of Washington-Lee High School follow this intent, such as the School's colors of Blue and Grey (the colors associated with the Union and Confederate uniforms, respectively), the School's yearbook name of "Blue and Grey," and the School's team name: "the Generals."

*Washington-Lee's History of Racial Diversity and Academic Excellence*

34.     Washington-Lee High School went on to have a long and prestigious history as one of the best high schools in the country.

35.     In the 1930s, the School had the first JROTC in northern Virginia.  A significant number of students enrolled to serve their country in this program.

36.     At the end of World War II, the student council dedicated a plaque containing the names of the students who gave their lives in that war.

37.     In 1949, Washington-Lee's yearbook was dedicated to students from Latin America, Asia, and Europe, boasting, "Student from all over the WORLD feel at home at W-L."

38.     Washington-Lee also became famous for its high academic standards.  In 1957, Washington-Lee was ranked in the top 38 high schools in the country.  Washington-Lee was the only Virginia school to make this list.

39.     In keeping with its name's spirit of understanding and reconciliation, Washington-Lee was also at the forefront of desegregation in Virginia.

40.     In September 1959, Washington-Lee became the first full high school (as opposed to a junior high school) in Virginia to integrate.

41.     In June 1960, Washington-Lee became the <u>first</u> integrated high school in Virginia to graduate an African-American student (tied with Norview High School in Norfolk).

42.     In 1961, Washington-Lee desegregated its school athletics.  In the following years, school officials fought to defend the rights of their African-American athletes during away games.

43.     In 1964, Washington-Lee held a Social Action for Equality mixer, which was featured in the School's yearbook.

44.     In 1966, Washington-Lee's basketball team won the state championship as the <u>first</u> integrated basketball team to do so.

45.     This legacy is well-remembered by alumni today: At a recent conference, African-American students from this time period recalled the support they had received from students and faculty alike against the outside forces who had opposed integration.

46.     In addition to promoting racial equality, Washington-Lee continued to improve its high academic standards, and was rated the second-best high school in the nation in the 1960s.

47.     On a lighter note, Washington-Lee was also named the "grooviest high school" in Virginia.

48.     In 1985, the federal Department of Education named Washington-Lee a National School of Excellence.

49.     In 2007, Washington-Lee was ranked the 33rd-best high school in the country.

50.     Throughout the years, Washington-Lee's alumni have achieved numerous honors, ranging from Nobel Prize winners to Academy Award winners to Olympians.

51.     On May 4, 2012, President Barack Obama addressed the students of Washington-Lee, accompanied by Secretary of Education Arne Duncan, and noted that he was "impress[ed]" by the graduating seniors he had spoken with.

*The Alumni Association's Relationship with the School*

52.     In light of this esteemed history, the Alumni Association was founded decades ago by a large group of former students to help promote and support the School.  Though hailing from diverse backgrounds, these men and women were united by a love for Washington-Lee and its history.  These founders chose to name their organization the "Washington-Lee High School Alumni Association."

53.     Though disappointed with the recent treatment of the School by certain politicians (as complained of herein), the Alumni Association remains a proud affiliate of the School itself, with members from all backgrounds and walks of life.

54.     Throughout its existence, the Alumni Association has financially supported School-sponsored activities.

55.     The Alumni Association has also participated in community fairs, festivals, and alumni reunions.  At these events, the Alumni Association has sold merchandise with the School's name and logo to raise funds to help support School-sponsored activities.

56.     More specifically, when the School's new campus was completed in 2009, the Alumni Association promoted the School's tours of this campus.  The Alumni Association's volunteers scheduled and planned dialogue and provided tour guides.  These tours were attended by alumni and various community groups and helped to promote the School and its mission.

57.     The Alumni Association has also contributed annually to the Washington-Lee Educational Foundation, which engages in charitable activities to benefit the School, such as granting scholarships to the School's students and teachers.

58.     In return, the School recognizes the Alumni Association as the "go-to" organization for the School's alumni.

59.     As of the date of filing, the sole webpage in the "Alumni" tab of the School's website consists of an overview of the Alumni Association and contains a link to the Alumni Association's website, stating: "All those items that were most useful to you (Alumni Database, Digital Yearbook collection, Reunion Scorecard, Faculty Database) now reside there."  (Ex. A.)

60.     By their history and interactions, the School has granted the Alumni Association a de facto license to use the name "Washington-Lee High School."

*The Board Seeks to Rename Washington-Lee*

61.     On August 17, 2017, then-Chair Kanninen announced that the Board should make sure Arlington County's schools had names that the Board members thought reflected the values of the Arlington school system.  Based on her subsequent actions, it appears that when then-Chair Kanninen referred to the values of the Arlington school system, she meant her own values and those of the other politicians who ran the Arlington school system.

62.     In her August 17, 2017 statement, then-Chair Kanninen promised to allow the community to be involved in any process by which schools would be renamed.

63.     It now appears that Defendants and their predecessors had been strategizing for some time to rename Washington-Lee and other schools whose names they disliked.  However, they initially withheld these plans from the public.

64.     At this time, the naming of new schools in Arlington County was governed by APS Policy 50-1.10,[1] which provided as follows:

> The Arlington School Board reserves to itself the responsibility to name its facilities.  School facilities generally are named according to the geographical or historical relationships in which the site is located.  In cases where the name of an individual is proposed, the name shall be considered only after the individual has been deceased for five years.

---

[1] The APS polices are implemented by the Board to govern the operation of Arlington County's public schools.

The Superintendent is responsible for developing and implementing a process to present recommendations to the Board.  <u>This process will include representation from the occupants of the building, the immediate neighborhood, and the broader Arlington community.</u>

(Ex. B (emphasis added).)

65.    Not only did this policy apply objective criteria—namely, "geographical or historical relationships" and the date of an individual's death—but it expressly required community involvement in the naming process.  These standards guaranteed that the school names would reflect the beliefs and values of the entire community, and not the private predilections of politicians, e.g., the members of Board.

66.    Prior to the June 7, 2018 revisions, there was no official APS policy allowing the renaming of existing schools.  (*See id.*)

*Defendants Announce a Timetable for Considering New Naming Criteria,*
<u>*But Do Not Mention Renaming Washington-Lee*</u>

67.    In the fall of 2017, Defendants decided to revise APS Policy 50-1.10 and adopt a new naming policy that would govern the naming of new schools.  While Defendants mentioned that this revised policy would also be applied when considering whether to rename existing schools, they did not disclose that they intended to use it to rename Washington-Lee.  Upon information and belief, this is the first time the Board ever embarked on an effort to adopt a formal policy governing renaming existing schools.

68.    Specifically, at a public meeting on September 21, 2017, the Board gave a "Priorities for 2018" presentation.  In so doing, the Board said nothing about changing Washington-Lee's name.

69.    On that same date (September 21, 2017), Deputy Superintendent Erdos gave a presentation on the "Process to Develop Criteria for the APS Naming Policy 50-1.10."  (*See* Ex. C.)  This process was primarily presented as a means of drafting new criteria for naming new

schools.  These criteria were also to be used in considering whether to rename existing schools.
This process was to have four stages:

70.     In Phase I, a Staff Committee would be formed from "a diverse representation of
APS staff" to review the provenance of the current school names, "[e]ngage the [APS] [s]taff,
students, families, alumni, [and] community" to get feedback on naming criteria, and develop Draft
Naming Criteria.  (*Id.* at 3-5.)  This phase was to be completed "later in the [2017-18] school year."
(*Id.* at 5.)

71.     In Phase II, the Staff Committee would present its Draft Naming Criteria to the
Board and would "identify names of APS schools, IF ANY, that may need to be considered for
renaming by their respective school communities," with any candidates for renaming being chosen
based on the Draft Naming Criteria.  (*Id.* at 6 (emphasis in original).)

72.     Importantly, in Phase III, the Board was to "engage the community for feedback on
the Draft [Naming] Criteria."  Methods of such engagement were to include public hearings,
emails, open office hours, and meetings with liaison groups.  (*Id.* at 7.)

73.     Following such community engagement, the Board would adopt new naming
criteria for the new schools and, if necessary, direct the Superintendent to begin the process of
renaming any already-existing schools that did not comply with the new policy.  (*Id.* at 8.)

74.     Finally, in Phase IV, names would be considered for two newly-constructed
schools.  During this phase, the Board would set a timeline for renaming any existing schools that
were to be renamed.  Any "new or revised" names chosen would have to be approved by the Board.
(*Id.* at 9.)

75.     Thus, *if* any schools were to be considered for renaming, they were to be nominated
for renaming by the Staff Committee, not the Board, and the question of whether to rename them

would be considered "by their respective school communities," not the Board.  (*Id.* at 6.)  Under this plan, the Board would only have approval power over "new or revised" names, not the decision whether to keep existing names.  (*Id.* at 9.)

76.     Ms. Erdos's September 21, 2017 presentation did not mention Washington-Lee as a candidate for renaming.

77.     Subsequently, on October 5, 2017, the Board unanimously adopted Ms. Erdos's proposed process without change.

78.     At a public meeting on November 14, 2017, Dr. Murphy presented a Superintendent's 2017-18 Action Plan Update which stated that they would be conducting community research regarding the naming criteria throughout November and December 2017 and that the Staff Committee would produce its Draft Naming Criteria in January 2018.  This discussion did not mention renaming Washington-Lee.

79.     Throughout the end of 2017, Superintendent's 2017-18 Action Plan Updates consistently adhered to the adopted timeline and made no mention of renaming Washington-Lee.

80.     At a public meeting on January 4, 2018, Dr. Murphy presented a Superintendent's 2017-18 Action Plan Update which stated that the Draft Naming Criteria would be delayed until April.  This presentation did not mention renaming Washington-Lee.

81.     At a public meeting on January 18, 2018, Dr. Murphy presented a Superintendent's 2017-18 Action Plan Update which stated that the Staff Committee was reviewing a study that Defendants themselves had commissioned from George Mason University regarding the school name issue ("GMU Study").  This presentation still did not mention renaming Washington-Lee and did not alter the timetable for the new naming criteria.

82.     The GMU Study noted that there was "an overwhelming consensus that the process for renaming a school and naming upcoming schools be separate" because "combining these two topics is nearly impossible as these issues involve two different ideologies."  (Ex. D at 12-13.)

83.     According to the GMU Study, the community wanted transparency and community involvement throughout the naming process, with a common comment being that any decision to change an existing name be by community vote.  (*Id.* at 12.)

84.     As a result, two of the GMU Study's five recommendations were to "Advertise [any] Meetings on Multiple Platforms" and "Establish Clear Processes."  (*Id.* at 13 (noting that "[t]he transparency and communication of this process is strongly desired").)

85.     Finally, the GMU Study noted that "providing a historical context to these discussions can alleviate common misconceptions and raise awareness for the context from which the surrounding structures were named."  (*Id.* at 14.)   In this case, the historical context for Washington-Lee's name—which was disregarded entirely in the Board's ultimate decision to rename the school—was a desire to mend the wounds from the American Civil War and build bridges between the North and the South without promoting the cause of either side of that war.

86.     As discussed below, even though Defendants had commissioned the GMU Study to guide them, they ultimately ignored that study's key recommendations: that the process involve community engagement and that existing school names be judged under different criteria from new school names.

*Defendants Broach the Possibility of Renaming Washington-Lee Under the New Criteria, But Retain the Promise of a Period for Public Comment Prior to any Renaming Decisions*

87.     In early 2018, Defendants, for the very first time, publicly indicated that the new naming policy might lead to Washington-Lee being renamed.  In keeping with the GMU Study's recommendations, Defendants promised that any consideration of renaming Washington-Lee

would be handled separately from the naming of the new schools, and that the decision whether to rename Washington-Lee would not be made until after a period for public comment in the fall of 2018.  However, as discussed below, Defendants did not keep these promises and apparently never intended to keep these promises, but only made these promises to suppress public participation in the decision whether to rename Washington-Lee.

88.     At a public meeting on February 1, 2018, Ms. Erdos presented a Superintendent's 2017-18 Action Plan Update.  (Ex. E.)  This presentation was the first official discussion of potentially renaming Washington-Lee.

89.     During this presentation, Ms. Erdos stated that the new naming criteria would be used for several new schools, indicating that these naming criteria would not be used to rename existing schools, in keeping with the GMU Study's recommendation.  (*Id.* at 3.)

90.     Instead, there was to be a special Phase IV and Phase V to deal with Washington-Lee, which would be separate from the Phase IV and Phase V for the other schools.  (*Id.* at 5-6.)

91.     Ms. Erdos explained that they had decided "to pull Washington-Lee aside understanding that the community has asked for more time."  However, as discussed below, Defendants did not fulfill this promise.

92.     Washington-Lee's Phase IV was to run from June to August 2018 and consist of forming an ad hoc committee from a diverse group of individuals and groups, including Washington-Lee alumni.  (*Id.* at 5.)  This committee would be charged with "engagement and community conversations."  (*Id.*)  However, Defendants never created such a committee due to the Board's decision to prematurely vote to change Washington-Lee's name on June 7, 2018.

93.     Washington-Lee's Phase V was to consist of community conversations from September to November 2018 culminating in one or more reports to the Board in December 2018.

(*Id.* at 6.)  Again, as discussed below, the only "conversations" Defendants actually allowed were limited to brief suggestions that were censored by Defendants.  Indeed, Defendants allowed no active discussion between the community and the committee that Defendants ultimately designated to consider a new name ("Naming Committee").

94.    Moreover, as detailed below, Defendants would ultimately stack the Naming Committee with their supporters and heavily censor any feedback from the community, including actively instructing the Naming Committee to disregard any feedback that did not conform to Defendants' agenda.  In particular, none of the approximately 30,000 alumni who resided outside Arlington County were allowed to apply to be on the Naming Committee, but one alumnae who was the daughter of a former Board member was allowed to be on the Committee despite living in a different part of the state.

95.    At the close of Phase V, the Board would decide whether to change the School's name in December 2018 or January 2019, and if it voted to change the name, it would "initiate [a] naming process to choose [a] new name beginning [in] Fall 2020."  (*Id.*).

96.    In reviewing the new plan, Ms. Erdos noted: "The main change is Washington-Lee and the reason we've set it aside different from the others is there's already conversation in the community, change or no change, and so we want to recognize the community's request for more time and that can take place while we're moving ahead with the other four buildings."  However, Defendants did not follow through with this promise to allow time for community conversation.

97.    After this presentation, then-Chair Kanninen promised that the Board would "hold [them]selves accountable" to the dates Ms. Erdos provided, noting that those dates would "give[] the community time to participate and weigh in and make sure that we're hearing from everyone."  However, the Board did not in fact hold themselves accountable to these dates, but instead

discarded them without warning in order to deny the community an opportunity to discuss whether Washington-Lee satisfied the new criteria.

98.     On February 2, 2018, Defendants publicized this new timeline and procedure in an official APS press release.  (Ex. F.)  This press release was further published by local papers.  (*See, e.g.*, Ex. G.)

99.     At a public meeting on February 15, 2018, Ms. Erdos presented a Superintendent's 2017-18 Action Plan Update that again confirmed this plan.  (Ex. H at 2-3.)

100.     While making this presentation, Ms. Erdos stated as follows:

> Washington-Lee as I mentioned we have decided, based on the interest of the community, to have greater conversations.  Our goal is in June through August to develop a statement of what tasks the committee should do and then to recruit an ad hoc committee.  The board will also have conversations on what the make-up of that committee should be.  Their goal would be to have that group meet September through November, have some community conversations to let both sides of this conversation for the Washington-Lee High School name have a conversation, a community conversation, and then with a report or reports to the school board in December.  After that, the board will obviously have to look and listen to what you have heard and what you have seen and make a decision on whether or not to keep or to change the name of Washington-Lee High School.

101.     However, Defendants did not in fact allow the community to be heard "on whether to keep or to change the name of Washington-Lee High School" but, as discussed below, voted to rename Washington-Lee immediately upon adopting the new naming criteria on June 7, 2018.

102.     At public meetings on March 8, 2018, March 22, 2018, April 5, 2018, May 3, 2018, and May 17, 2018, Dr. Murphy presented Superintendent's 2017-18 Action Plan Updates that continued to tout this plan, which, as mentioned, Defendants did not actually adhere to.

103.     Likewise, on April 19, 2018, Ms. Erdos sent the Alumni Association an email confirming that the process promulgated in February 2018, which included a period for public comment, was the process that Defendants would follow.  But again, Defendants never followed this process.

*Ms. Erdos Presents the Draft Naming Criteria and Asks to Rename Washington-Lee, and*
*the Board Reasserts the Promised Timetable for Evaluating Washington-Lee's Name*

104.    On May 31, 2018, the Board held a public meeting at which it considered the naming issue.

105.    At this meeting, the Board evaluated the Draft Naming Criteria and renewed their promised timetable: that after the Draft Naming Criteria were adopted in June, the public would have several months in the fall of 2018 in which they could comment on whether Washington-Lee's name complied with the new criteria.

106.    Defendants have an established practice of routinely emailing people with advance notice of the Board's meetings.  Several officers of the Alumni Association were signed up to automatically receive such emails.

107.    However, Defendants did not provide such email notice prior to the Board's May 31, 2018 meeting, where the Board discussed the Draft Naming Criteria and their proposed application to Washington-Lee.

108.     Defendants' decision to withhold this notice was likely calculated to suppress public participation at the May 31, 2018 meeting.

109.    In a presentation at the May 31, 2018 meeting, Ms. Erdos proposed amending the naming criteria for names based on individuals to add the following requirements:

- The individual played a critical role or contributed to society in ways that supported the success and well-being of the individuals who live in Arlington County, the Commonwealth of Virginia or the United States, now and in the future.

- The individual's "principal legacy" (i.e. the key activity, advocacy or accomplishment for which the individual is most known) aligns with or reflects the APS mission, vision, and core values and beliefs.

(Ex. I at 14; *accord* Ex. J at (proposed revisions).)

110.   The latter requirement was taken directly from criteria used by Yale University. (*See* Ex. I at 13 (discussing the Yale criteria).)

111.   Despite defining "principal legacy" subjectively to refer to the act "for which the individual *is most known*," neither Ms. Erdos nor the Board defined *whose* knowledge of the individual would be controlling.

112.   Ms. Erdos and the Board also failed to address the question of who defined APS's "core values and beliefs."

113.   Ms. Erdos's presentation went on to assert that Washington-Lee High School's name did not meet these criteria for the following reason:

> Robert E. Lee's "principal legacy" . . . was as General of the Confederate Army leading forces against the U.S. forces.  This action does not reflect the APS mission, vision, and core values/beliefs.

(*Id.* at 16.)

114.   This statement illustrates how the "principal legacy" standard is wholly subjective in nature and untethered from any objectively verifiable guidelines.  Because this subjective standard is so malleable, it can be used by those in power with an agenda to achieve whatever outcome they desire, as Defendants have done here.

115.   Likewise, Ms. Erdos apparently defined APS's "core values and beliefs" based on the Board members' personal values and beliefs.  In so doing, Ms. Erdos and the Board disregarded the difference between a public institution such as APS, which must recognize the diversity of beliefs in its community and not impose the personal beliefs of those in power, and a private institution such as Yale, which is free to promote its leaders' own agendas.

116.   Indeed, it was inappropriate for Defendants to substitute their own beliefs regarding Robert E. Lee's legacy over the views of the community at large.  Such actions are especially

striking here, where the name "Washington-Lee" was originally chosen to promote *reconciliation* between Union and Confederate supporters.

117.    However, neither Ms. Erdos nor the Board considered these key questions regarding the subjective nature of the proposed naming criteria or the key differences between APS and Yale that made borrowing Yale's subjective criteria wholly inappropriate for APS.

118.    Indeed, the few members of the public who spoke at the May 31, 2018 meeting all opposed renaming Washington-Lee.

119.    Even at this point (the May 31, 2018 meeting), neither Ms. Erdos nor the Board proposed deviating from the published plan for considering Washington-Lee's name or eliminating the public comment period that was scheduled for the fall of 2018.

120.    Instead, Ms. Erdos's presentation reaffirmed this process.  (*Id.* at 18.)

121.    Under this process, the Draft Naming Criteria were to be voted upon at the Board's upcoming June 7, 2018 meeting.

122.    In response to a question by Mr. Goldstein (at the May 31, 2018 meeting) requesting community involvement in the Washington-Lee naming controversy, Ms. Talento stated that the community could provide input on Washington-Lee's name after the Draft Naming Criteria were adopted.

123.    In hindsight, it appears that then-Chair Kanninen, at least, had already planned to vote on whether to rename Washington-Lee at the June 7, 2018 Board meeting, but deceptively concealed this plan from the public and from at least some of her fellow Board members.

*The Board Violates its Own Published Timetable and Surreptitiously Votes to Rename*
*Washington-Lee, Bypassing the Promised Period for Public Comments*

124.    The Board held its next meeting on June 7, 2018.

125.    As with the May 31, 2018 meeting, Defendants did not send out their customary email notice prior to the June 7, 2018 meeting.

126.    Defendants' decision to withhold this notice was likely calculated to suppress public participation at the June 7, 2018 meeting.

127.    The Board's policy regarding its meetings stated that "[e]xcept for administrative items, matters shall be placed on the agenda of one Board meeting for information and on the agenda of a subsequent Board meeting for action in order to allow ample opportunity for community discussion and Board deliberation prior to action."  APS Policy 10-4.

128.    This policy further provided for the agenda to be published as follows:

- The agenda for each Board meeting will be prepared by the Superintendent and accepted by the Board Chairman.

- The agenda and materials shall be available in the School Board office in advance of each meeting for public review. The agenda and related materials will also be made available to news media representatives.

- [T]he Board shall offer an opportunity for public comment on agenda items.

*Id.*

129.    However, the published agenda for the June 7, 2018 meeting—which was published in advance of the meeting to inform the public of the topics for discussion—indicated that the Board would <u>not</u> consider whether to rename Washington-Lee at that meeting.  (*See* Ex. K; Ex. L (original agenda).)  That is because there is no mention on the otherwise comprehensive agenda of voting to rename Washington-Lee.  (*See* Ex. L.)  Instead, this agenda only stated that "[t]he Board will hear proposed revisions to School Board Policy 50-1.10 Naming of Facilities."  (*Id.* at 1.)

130.    It appears that the Board deliberately omitted the question of whether to rename Washington-Lee from its agenda in order to suppress public participation at the June 7, 2018 meeting.

131.    Indeed, Ms. Talento later admitted at a meeting with certain Washington-Lee students that the Board refused to engage in the promised community outreach or involvement before deciding to rename Washington-Lee.

132.    At the June 7, 2018 meeting, the Board adopted the proposed Draft Naming Criteria.

133.    After completing all of the items on its agenda, the Board voted to rename Washington-Lee.  Surprisingly, the Board did so in violation of <u>both</u> its own published agenda and its publicized timetable.

134.    Thus, instead of providing the community, including the Alumni Association and its members, with several months to discuss whether to rename Washington-Lee under the new criteria, as repeatedly promised under the publicized timetable, the Board prevented the community from having any involvement in this decision.

135.    The decision whether to revise this timetable was never listed on the agenda for the June 7, 2018 meeting.

136.    These actions not only contradicted the Board's public statements, but also Defendants' own aforementioned policies for providing notice of contemplated actions, as set forth in APS Policy 10-4 (relating to the process of putting items on the Board's agendas).

137.    Likewise, the Board's actions also violated Robert's Rules of Order, thereby adding to the procedural impropriety of these actions and providing an additional reason why they are null and void.  *See generally* RONR (11th ed.) §§ 1-2, 10, 39, 41, 47 (stating the proper procedure); APS Policy 10-4 ("Except where superseded by these policies or other applicable law, all meetings will be conducted in accordance with ***Robert's Rules of Order, Newly Revised***." (emphasis in original)).

138.    Following the meeting, the Board doctored the agenda for the June 7, 2018 meeting to include a line item that a vote would be taken to rename Washington-Lee.  (*See* Ex. K; Ex. M (revised agenda).)  However, even the doctored agenda still did not mention the issue of whether to alter the publicized timetable by removing the period for public comment on whether to rename Washington-Lee.

139.    The Board doctored its agenda to deceive the public and make it appear as if the Board had provided notice of its intent to immediately address the issue of whether to rename Washington-Lee, when, in fact, the Board had provided no such notice.  (*Compare* Ex. L (agenda published prior to June 7, 2018 meeting) *with* Ex. M (agenda with post-meeting revisions).)

140.    The decision to circumvent the promised period for public comment on the possible name change meant that the public, including the Alumni Association, never had an opportunity to comment on whether Washington-Lee's name complied with the newly adopted naming criteria. This omission was especially problematic given the subjective nature of the new criteria and their reliance on both public perception and "beliefs and values": the Board never gave the public an opportunity to report how *they* perceived Robert E. Lee's principal legacy or whether that legacy complied with *their* (the public's) beliefs and values.

141.    Had the public had the opportunity to comment on this issue, many would have reported that they considered Robert E. Lee's legacy to be one of education, honor, loyalty to one's home state, and ultimately peacemaking, and that his legacy complied with their beliefs and values.

142.    It is likely that one of then-Chair Kanninen's motivations for ignoring the promised process was to avoid having the decision of whether to rename Washington-Lee be a pending issue when she ran for reelection to the Board in November 2018.

143.    Moreover, as detailed below, it appears that the Board wanted to go into the community engagement and feedback phase with the ability to shut down any feedback in support of keeping the name by claiming that that question had already been decided.

144.    Thus, the Board members apparently colluded with each other via the above conduct to defraud the community out of their opportunity to comment on whether to change the School's name, in violation of fundamental principles of government transparency.

145.    This decision also prevented the promised ad hoc committee from being formed.

*Defendants Also Improperly Suppress Public Discourse During the Selection of a New Name*

146.    Having prematurely voted to change the name, Defendants never formed the promised ad hoc committee to consider whether a name change was warranted.

147.    Instead, Defendants created a new committee, the Naming Committee, to consider a new name for Washington-Lee.

148.    None of the approximately 30,000 Washington-Lee alumni residing outside Arlington County were allowed to apply for membership on the Naming Committee (although, as discussed below, Defendants appointed a non-resident alumnae who was the daughter of a former Board member to be one of the four alumni representatives on the Committee).

149.    The Naming Committee met on several occasions.  These meetings were held at the APS's public meeting room, and were open to the public.

150.    As the leaders of APS, Defendants collectively oversaw and directed others in overseeing these meetings.

151.    In particular, the Naming Committee was overseen by Ms. Erdos, Washington-Lee Principal Gregg Robertson, and a professional facilitator hired by Defendants.

152.    Ms. Erdos attended all of the Naming Committee meetings even though the paid facilitator was also present and the plan only required one of the two to be present.  When asked why she was present for the meetings, Ms. Erdos stated, "Because the School Board wants me here," indicating that she was acting as an agent of the Board at these meetings.

153.    Defendants notified the public of these meetings and invited them to participate.

154.    Despite the timeline's call for public participation at this point, Defendants actively worked to silence anyone who expressed support for returning to the name "Washington-Lee" or any variant thereof, including the Alumni Association and its members.  Consequently, there was no community engagement or feedback.

155.    By way of example and without limitation, a non-comprehensive list of such abuses is as follows:

      a.    In selecting members for the Naming Committee, it appears that Defendants favored individuals whom they thought would support their agenda.  For example, only four of the twenty-three Committee members were Washington-Lee alumni, and one of these alumni was the daughter of a former Board member who had been a vocal proponent of the name change during her tenure on the Board.  Notably, this alumnae did not even reside in or around Arlington County, but in a different part of the state.  Yet she was selected for the Committee despite Defendants' general policy barring non-resident alumni from even applying for the Committee.  Another Committee member went into the first meeting displaying great knowledge of the Board's reasoning and goals despite the fact that the Board had not yet discussed such matters with the Naming Committee.  It appears that these Committee members and others were

deliberately planted by Defendants in order to exert control over the Naming Committee's discussions and to ensure the Committee reached the conclusion Defendants desired.

b.  Throughout the Naming Committee's meetings, Deputy Superintendent Erdos showed great deference to the Committee member who was the daughter of a former Board member, often silencing other Committee members so that the former Board member's daughter could dominate the discussion.

c.  At one point, Ms. Erdos sent out a notice to the community asking for input on a new name.  Over 750 people responded to this request, and Ms. Erdos's staff compiled their responses into a summary for the Naming Committee.  Notably, 85% of the people who responded to this survey wanted to keep the name "Washington-Lee," either with no changes (the majority view) or by designating the word "Lee" to refer to a different individual with that surname. Because these results were unfavorable to Defendants, Defendants quickly instructed the Naming Committee to disregard this survey.

d.  When a Committee member proposed changing the word "Lee" in the school's name to refer to a different "Lee," such as prominent African-American Virginian William Lee, the meeting facilitator hired by Defendants slammed the table and said: "What is it that you do not understand about renaming?"  The meeting facilitator then ordered this Committee member to "stop talking" and not discuss naming the School after people named Lee.

e.  When another Committee member suggested that the Naming Committee should recommend reinstating the name "Washington-Lee," Ms. Erdos

responded with an email advising this member to no longer participate in voting.  This email read in relevant part:

> [T]here are two choices available to you:
> - You may continue to attend our meetings and simply abstain from voting for a new name, or
> - You may choose to step down from serving on the committee and I will relate your decision to the School Board.

f.   As a result of Defendants' strong-arm tactics, three Committee members resigned in protest of the sham process.  These resignations included two of the three non-Board-affiliated Washington-Lee alumni.  As a result, the version of the Naming Committee that delivered the "recommendation" to the Board contained only one Washington-Lee alumnus other than the daughter of the former Board member who had campaigned for the name change.

g.   Although Defendants had promised that this time period would be designed to facilitate public commentary, Defendants banned members of the public from making any comments at the Naming Committee's meetings.  Instead, public comment was limited to a suggestion box that only allowed very brief statements.  Moreover, comments in that suggestion box were subject to screening by Defendants and their agents before the Naming Committee could see them.  Ultimately, the Naming Committee rarely discussed any of the public suggestions, in contrast to Defendants' earlier promises that this phase existed to obtain public feedback.

h.   Indeed, Defendants expressly instructed the Naming Committee members to not talk to members of the public.

i.  If members of the public who favored the name "Washington-Lee" attempted to comment or engage in discussion at the Naming Committee's meetings, they were threatened with arrest.

j.  For example, at one meeting, a member of the public asked a police officer if she could display a banner stating "Washington-Lee: Blue and Gray symbolizing Unity" ("Unity Banner").  The police officer told her that she could.  However, during the meeting, Ms. Erdos demanded that she not display her banner.  When the member of the public mentioned that the police officer had given her permission to do this, Ms. Erdos declared that the police officer worked for her and repeated her demand.  Another police officer at the meeting later agreed that there was no reason for Ms. Erdos to object to the banner.  Moreover, no one on the Naming Committee expressed any objection to the Unity Banner; the sole objections came from Ms. Erdos and the facilitator.

k.  This ban on public speech was enforced even when the contact was initiated by Committee members.  For example, when Committee members repeatedly requested information on how to contact Washington-Lee alumni, officers of the Alumni Association who were present attempted to answer these questions, but were silenced by Defendants and their agents, who threatened to arrest and prosecute these officers if they continued to speak.

l.  Thus, it appears that the restrictions on public comment were not intended to prevent disruption, but to prevent members of the community from airing any opinion that might conflict with Defendants' views.

156.    All of the foregoing acts of misconduct were taken collectively by Defendants and/or by their agents or employees who were acting under the direction and/or subject to their collective control.

157.    Each Defendant adopted and ratified the actions taken by their agents and employees with respect to the Naming Committee.

158.    During this time period, Defendants were also overseeing a similar community feedback process that was occurring with respect to Stratford Junior High School ("Stratford").[2] During this process, APS allowed certain pre-approved members of the community and certain organizations to address the Stratford naming committee.  In selecting members of the community to speak, Defendants favored individuals who favored the name change over those who opposed the name change.

159.    Meanwhile, while Defendants were busy forcing these unlawful name changes, they neglected their proper duties to manage the schools.  Specifically, the U.S. Department of Justice charged Defendants with violating the Equal Educational Opportunities Act of 1974, 20 U.S.C. §§ 1701 *et seq*., by failing to provide sufficient accommodations for students who did not speak English as their first language.

160.    Following this strictly-controlled process and the stifling of all dissenting voices, the Board ultimately decided upon the name "Washington-Liberty High School" for the School.

161.    After the Board voted to adopt the new name, but before Defendants implemented this change, the Alumni Association sent Defendants an email warning that this name change was unlawful.  However, Defendants did not heed this warning.

---

[2] "Stratford" was the name of Robert E. Lee's birthplace and childhood home.

*The Alumni Association and its Members Are Injured by the Board's Actions*

162.    The purported name change has caused the Alumni Association to lose prestige as it no longer shares its name with the School.

163.    This change has also caused confusion among the Alumni Association's members and potential donors, many of whom have stated that they were confused by the fact that the Alumni Association has a different name from the School.

164.    Changing the Alumni Association's name to "Washington-Liberty" would not cure this injury.  Not only would such a change be costly, but it would cause the Alumni Association to lose its connection with the School's past accomplishments and confuse members and potential donors who still remember the School as "Washington-Lee."

165.    Thus, the Alumni Association is put in the position of either losing its association with the School's past accomplishments or losing its association with the School's present accomplishments.  Either way, its reputation and standing in the community will continue to suffer severe harm.

166.    Likewise, the Alumni Association must choose between either confusing members and donors who know the School's current name or confusing members and donors who remember the School by its previous name.

167.    Additionally, Defendants' actions have denigrated the Alumni Association by constituting an official government declaration that Defendants consider the School's name—and, by extension, the Alumni Association's name—to be socially unacceptable.

168.    As a result of the foregoing, the Alumni Association has suffered a severe loss in membership and donations.

169.    These losses have impeded and are continuing to impede the Alumni Association's operations by rendering the Alumni Association unable to fund activities that it would otherwise have funded.

170.    The Alumni Association's operations have also been directly affected by the purported name change.  For example, several individuals have expressly stated that they will not donate to benefit the School's programs because of the name change.  From this, it can be inferred that the name change has caused numerous alumni to refrain from aiding in the Alumni Association's work to benefit the School.[3]

171.    This decrease in Alumni Association's operations will only cause the Alumni Association to lose even more members and donations.

172.    In short, the School's purported name change has sent the Alumni Association into a downward spiral from which it will have great difficulty recovering.

173.    Furthermore, the Alumni Association's members have suffered and will suffer a loss of both reputation and academic and employment opportunities, as many potential colleges, universities, and employers are unfamiliar with the name "Washington-Liberty High School" and will not associate that name with Washington-Lee's esteemed history and prestige as one of the best high schools in the country.

174.    Many of these Alumni Association members will not have, and will not have had, the option of clarifying in their college or employment applications that "Washington-Liberty High

---

[3] It is common knowledge in dealing with the public that for every patron who complains there are dozens of others whose decision-making has been influenced but who have not expressly stated their complaints.  *See, e.g.*, Hulya Aksu, *Customer Service: The New Proactive Marketing*, HUFFPOST (May 26, 2013), https://www.huffpost.com/entry/customer-service-the-new-_b_2827889 (citing the White House Office of Consumer Affairs for the statistic: "For every customer who complains, 26 others don't speak up").

School" is the prestigious "Washington-Lee High School" as many of these applications use forms that do not allow for such clarification.

175.    For example, at least two common college application forms—the Common Application and the Coalition Application—are structured in such a way that the School's graduates will be forced to designate their alma mater simply as "Washington-Liberty High School."  As a result, these students will be unable to show on their forms that they are graduating from the prestigious Washington-Lee High School.  It is as if Harvard graduates were forced to list their alma mater as "Freedom University."

176.    Accordingly, not only has the Alumni Association itself been devastated by the effects of the invalid name change, but many of its members have also been, and will continue to be, personally harmed by Defendants' actions in this matter.

## COUNT I: PROCEDURAL DUE PROCESS (Federal)

177.    The allegations of Paragraphs 1 through 176 are re-alleged and incorporated by reference as though fully set forth herein.

178.    42 U.S.C. § 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

179.    Defendants are state actors.

180.    The Due Process Clause of the federal Constitution provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.

181.    The Alumni Association has a liberty interest in its reputation.

182.    Because of Defendants' actions, the Alumni Association is now forced to choose between either changing its name, thereby losing its association with the School's long and respected history and confusing potential members and donors who knew the School as "Washington-Lee," or retaining its current name, thereby losing its association with the School.

183.    Thus, the Defendants' actions have injured the Alumni Association's reputation by severing its connection to the School.

184.    Defendants have also injured the Alumni Association's reputation by denigrating its name as socially unacceptable.

185.    These actions have further interfered with the Alumni Association's operations and caused it to lose members and donors.

186.    Defendants have further injured the Alumni Association's members' reputations by depriving them of their association with the School's prestigious history.

187.    Additionally, the School has, by its course of practice, granted the Alumni Association an implied license to the name "Washington-Lee High School" in consideration for the extensive work that the Alumni Association has done to aid the School and its students.

188.    Defendants' improper actions have severely reduced the value of this license.

189.    In taking the above actions, Defendants have denied the Plaintiff, including its members, due process by actively preventing them and other members of the public from participating in the consideration of whether to change the School's name.

190.    Actions Defendants and their agents and employees have taken to suppress public participation include (but are not limited to):

    a.    Failing to provide the standard notice of the May 31, 2018 meeting.

b.  Failing to provide the standard notice of the June 7, 2018 meeting.

c.  Publishing an agenda in advance of the June 7, 2018 meeting that deliberately omitted the fact that the Board intended to take a vote at that meeting on whether to rename Washington-Lee.

d.  Repeatedly promising the public, including the Alumni Association, that they would have several months in the Fall of 2018 (after the new naming criteria were adopted) to comment on whether to change Washington-Lee's name, but surreptitiously changing the name months before this comment period was to begin.

e.  Deceiving the public, including the Alumni Association, regarding when the Board would decide whether to change Washington-Lee's name.   Upon information and belief, Defendants deliberately colluded in this deception.

f.  Depriving the public, including the Alumni Association, of a reasonable opportunity to comment on whether to change Washington-Lee's name.

g.  Voting to change Washington-Lee's name in violation of the promised timetable without ever formally considering whether to change that timetable or allowing the public, including the Alumni Association, to comment on this change to the timetable.

h.  Denying the public, including the Alumni Association, any opportunity to comment on whether Robert E. Lee's principal legacy aligned with their core values and beliefs.

i.  Exerting improper control over the Naming Committee's work and stifling participation by the public, including the Alumni Association, in order to ensure

that the Naming Committee did not return to the name "Washington-Lee" or any variant thereof.

191.    All of the foregoing actions were taken by Defendants or by individuals acting on behalf of and under the control off each and all of the Defendants.

192.    Defendants' continuous efforts to stymie public participation, including the Alumni Association's participation in this matter, which included active deception of the public to mislead them regarding the proper time for offering feedback, render their procedures constitutionally inadequate.

## COUNT II: PROCEDURAL DUE PROCESS (Virginia)

193.    The allegations of Paragraphs 1 through 192 are re-alleged and incorporated by reference as though fully set forth herein.

194.    The Due Process Clause of the Virginia Constitution provides "[t]hat no person shall be deprived of his life, liberty, or property without due process of law."  Va. Const. art I, § 11.

195.    The Alumni Association has a liberty interest in its reputation.

196.    Because of Defendants' actions, the Alumni Association is now forced to choose between either changing its name, thereby losing its association with the School's long and respected history and confusing potential members and donors who knew the School as "Washington-Lee," or retaining its current name, thereby losing its association with the School.

197.    Thus, Defendants' actions have injured the Alumni Association's reputation by severing its connection to the School.

198.    Defendants have also injured the Alumni Association's reputation by denigrating its name as socially unacceptable.

199.    These actions have further interfered with the Alumni Association's operations and caused it to lose members and donors.

200.    Defendants have further injured the Alumni Association's members' reputations by depriving them of their association with the School's prestigious history.

201.    Additionally, the School has, by its course of practice, granted the Alumni Association an implied license to the name "Washington-Lee High School" in consideration for the extensive work that the Alumni Association has done to aid the School and its students.

202.    Defendants' improper actions have severely reduced the value of this license.

203.    In taking the above actions, Defendants have denied the Plaintiff, including its members, due process by actively preventing them and other members of the public from participating in the consideration of whether to change the School's name.

204.    Actions Defendants and their agents and employees have taken to suppress public participation include (but are not limited to):

    a.   Failing to provide the standard notice of the May 31, 2018 meeting.

    b.   Failing to provide the standard notice of the June 7, 2018 meeting.

    c.   Publishing an agenda in advance of the June 7, 2018 meeting that deliberately omitted the fact that the Board intended to take a vote at that meeting on whether to rename Washington-Lee.

    d.   Repeatedly promising the public, including the Alumni Association, that they would have several months in the Fall of 2018 (after the new naming criteria were adopted) to comment on whether to change Washington-Lee's name, but surreptitiously changing the name months before this comment period was to begin.

e.  Deceiving the public, including the Alumni Association, regarding when the Board would decide whether to change Washington-Lee's name. Upon information and belief, Defendants deliberately colluded in this deception.

f.  Depriving the public, including the Alumni Association, of a reasonable opportunity to comment on whether to change Washington-Lee's name.

g.  Voting to change Washington-Lee's name in violation of the promised timetable without ever formally considering whether to change that timetable or allowing the public, including the Alumni Association, to comment on this change to the timetable.

h.  Denying the public, including the Alumni Association, any opportunity to comment on whether Robert E. Lee's principal legacy aligned with their core values and beliefs.

i.  Exerting improper control over the Naming Committee's work and stifling participation by the public, including the Alumni Association, in order to ensure that the Naming Committee did not return to the name "Washington-Lee" or any variant thereof.

205.  All of the foregoing actions were taken by Defendants or by individuals acting on behalf of and under the control off each and all of the Defendants.

206.  Defendants' continuous efforts to stymie public participation, including the Alumni Association's participation in this matter, which included active deception of the public to mislead them regarding the proper time for offering feedback, render their procedures constitutionally inadequate.

### COUNT III: FREEDOM OF SPEECH (Federal & Virginia Constitutions)

207.    The allegations of Paragraphs 1 through 206 are re-alleged and incorporated by reference as though fully set forth herein.

208.    42 U.S.C. § 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

209.    Defendants are state actors.

210.    The First Amendment of the federal Constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend I.

211.    The Fourteenth Amendment of the federal Constitution imposes this requirement upon all state actors.  *E.g.*, *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958).

212.    The Virginia Constitution provides similar free speech protections.  Va. Const. art I, § 12. ("[T]he General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.").  *See generally Elliott v. Commonwealth*, 267 Va. 464, 473-74, 593 S.E.2d 263, 269 (2004) ("Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment.").

213.    The Naming Committee's meetings were public fora.

214.    Defendants all oversaw and supervised the Naming Committee, each possessed authority and control over all actions taken with respect to the Naming Committee, and ratified those actions.

215.    Defendants' decision to suppress public commentary at meetings that were promised as opportunities to receive public feedback was unreasonable.

216.    In particular, limiting public feedback to a suggestion box was unreasonable especially when the suggestion box did not allow lengthy discussion and the comments submitted therein were subject to censorship by Defendants or their agents who were managing the Naming Committee.  Upon information and belief, Defendants screened out any comments with which they disagreed and did not allow the Naming Committee to consider such comments.

217.    Defendants also had no reasonable basis for refusing to allow silent speech, such as the Unity Banner, despite such speech posing no danger of disruption.

218.    Moreover, Defendants applied these policies in a non-viewpoint-neutral manner. This viewpoint discrimination is evidenced by, among other things, Defendants' instruction that the Naming Committee discard the public survey because Defendants disagreed with its results.

219.    Defendants' viewpoint discrimination is further evidenced by the fact that they cherry-picked which members of the community could address the Stratford naming committee.

220.    Defendants further chilled speech that disagreed with their viewpoint by being quick to threaten arrest and prosecution against any members of the public who voiced opposition to Defendants' viewpoint.

221.    Defendants' viewpoint discrimination is further illustrated by the fact that they did not even permit members of the Naming Committee to discuss options Defendants opposed (e.g.,

redesignating "Lee" to refer to a different individual with that surname), but even chilled dissenting speech among the Naming Committee members.

222.    Had Defendants not taken these actions in violation of the First Amendment, the Naming Committee would likely have readopted the name "Washington-Lee," given the overwhelming public support for this preference.  Indeed, 85% of the surveyed members of the community wanted the School to retain the name "Washington-Lee."  Such an outcome would have prevented the injuries suffered by the Alumni Association and its members.

## COUNT IV: VIRGINIA MEMORIAL PROTECTION STATUTE

223.    The allegations of Paragraphs 1 through 222 are re-alleged and incorporated by reference as though fully set forth herein.

224.    Virginia Code §§ 15.2-1812, 15.2-1812.1, 15.2-1812.2, 18.2-137, collectively known as the "Memorial Protection Statute," protect memorials concerning the following conflicts (among others): "French and Indian [War] (1754-1763), Revolutionary [War] (1775-1783), . . . Mexican [War] (1846-1848), [and] Confederate or Union monuments or memorials of the War Between the States (1861-1865)."

225.    In 1925, the School was inaugurated as "Washington-Lee High School."

226.    Thereafter, Arlington County authorized and permitted the School to operate under that name, even levying taxes to fund the School's operations under that name.  Until recently, the School has used that name for almost a century.

227.    It is common knowledge that something (e.g., a school) that is named after an individual thereby serves as a memorial to that individual.  *See* WEBSTER'S II NEW COLLEGE DICTIONARY 700 (3d ed. 2005) (defining "memorial" as "[s]omething, as a monument or a holiday, designed or established to preserve the memory of a person or event"); *see also, e.g., Chevron*

*Mining, Inc. v. N.L.R.B.*, 684 F.3d 1318, 1323 (D.C. Cir. 2012) (relying on this definition).  Indeed, it is for this reason that Defendants sought to rename Washington-Lee: they did not want the School's name to continue to serve as a memorial to General Lee.

228.   The name "Washington-Lee High School" memorializes two renowned generals who lived in the Arlington County area:  General George Washington and General Robert E. Lee.

229.   Accordingly, the name "Washington-Lee High School" is a memorial to General Washington and General Lee within the meaning of the Memorial Protection Statute.

230.   Additionally, the selection of General Washington and General Lee was intended to memorialize the American Civil War, otherwise known as the War Between the States, and was intended to promote reconciliation between the former Union and Confederate states.

231.   Accordingly, the name "Washington-Lee High School" is also a joint Union and Confederate memorial of the War Between the States within the meaning of the Memorial Protection Statute.

232.   Furthermore, by referencing General Washington in the context of the School's other regalia (e.g., the team name "the Generals"), the name "Washington-Lee High School" is a memorial to General Washington's distinguished military career and service in the French and Indian War and/or the Revolutionary War within the meaning of the Memorial Protection Statute, and to those wars themselves.

233.   Likewise, by referencing General Lee in the context of the School's other regalia (e.g., the team name "the Generals"), the name "Washington-Lee High School" is a memorial to General Lee's distinguished military career and service in the Mexican War and/or the War Between the States within the meaning of the Memorial Protection Statute, and to those wars themselves.

234.    Defendants' actions in attempting to change the name of Washington-Lee to "Washington-Liberty High School" violated and encroached upon this memorial by removing the remembrance of General Lee, the War Between the States, and the Mexican War.

235.    This removal of the memorial of General Lee and the War Between the States was the intended purpose of Defendants' actions.

236.    The School is publicly owned.

237.    Over sixty days have elapsed since Defendants took these actions and the County Attorney for Arlington County has not commenced an action under Virginia Code § 15.2-1812.1(1).

238.    As the alumni association for the school, the Alumni Association has an interest in the School's name.

239.    The Alumni Association further has an interest in the School's name because, as discussed above, the name change has caused and will continue to cause damage to its ongoing operations:  The name change has placed the Alumni Association in the unenviable position of having to either lose its current connection to the School or change its name and sacrifice its connection to the School's prestigious history.  The change has already caused, and will continue to cause, the Alumni Association to lose both members and donors.

240.    Finally, the Alumni Association's members have an interest in the School's name as this name change would deprive them of their association with the School's prestigious history.

241.    Defendants' obvious violation of their own promised processes and falsification of information to the public, as well as their clear purpose of removing the memorialization of General Lee and the War Between the States, demonstrate that their actions were reckless, willful, and wanton.

242.    This reckless, willful, and wanton conduct resulted in the defacement of, malicious destruction of, unlawful removal of, and placement of improper markings on the aforementioned memorials.

## COUNT V: DILLON RULE

243.    The allegations of Paragraphs 1 through 242 are re-alleged and incorporated by reference as though fully set forth herein.

244.    Virginia school boards only have the authority to exercise powers that are expressly granted, necessarily or fairly implied from expressly-granted powers, or essential and indispensable.

245.    Virginia law does not expressly grant school boards the authority to rename existing schools to ensure that their namesakes are perceived as conforming to the "core values and beliefs" of the sitting school officials.  *See* Va. Code § 22.1-79.

246.    None of the powers expressly granted to Virginia school boards necessarily or fairly imply the authority to rename existing schools to ensure that their namesakes are perceived as conforming to the "core values and beliefs" of the sitting school officials.

247.    The ability to rename existing schools, as opposed to the ability to name new schools, is not essential or indispensable to the operation of a school board, as there is no reason why schools cannot continue to operate under the names they were originally given.

248.    Despite these facts, Defendants purported to rename Washington-Lee based on their subjective determination that Robert E. Lee's legacy did not align with the board members' own values and beliefs.

249.    The Alumni Association has been injured by this action because, as discussed above, the name change has severed the Alumni Association's name from the School's, thereby

causing confusion among prospective members and donors, has denigrated that name as publicly unacceptable, and has caused the Alumni Association's members to lose the prestige of having attended Washington-Lee High School.

## COUNT VI: DECLARATORY JUDGMENT

250.    The allegations of Paragraphs 1 through 249 are re-alleged and incorporated by reference as though fully set forth herein.

251.    For all of the reasons discussed above, Defendants' actions in purporting to change the School's name are illegal, invalid, and void ab initio.

252.    Additionally, Defendants' actions in deceiving the public regarding the timetable for considering the name change, including omitting this matter from the pre-meeting agenda for the June 7, 2018 meeting at which the Board voted to change the School's name, violate the requirements of Virginia Code § 2-2-3707 that "[a]ll meetings of public bodies be open" and that notice and a copy of the agenda be posted in advance, again rendering the vote to change Washington-Lee's name void.  *See generally Renkey v. Cnty. Bd. of Arlington Cnty.*, 272 Va. 369, 376, 634 S.E.2d 352, 356 (2006).

253.    Furthermore, by deciding to vote on Washington-Lee's name prematurely in violation of its promised timetable, the Board was arbitrary and capricious, abused its discretion, and exceeded its authority, rendering that vote void.  *See generally id.*

254.    As discussed above, there is an actual controversy regarding the School's name.

255.    Accordingly, pursuant to 28 U.S.C. § 2201(a), Plaintiff seeks declaratory judgment that the name change is invalid and the School's name properly remains Washington-Lee High School.

## COUNT VII: INJUNCTIVE RELIEF

256. The allegations of Paragraphs 1 through 255 are re-alleged and incorporated by reference as though fully set forth herein.

257. Defendants' actions have irreparably injured the Alumni Association by forcing it to either (1) retain its current name despite the difference from the School's name, thereby dissociating itself from the School and causing confusion for alumni who will graduate after the name change, or (2) change its name to "Washington-Liberty High School Alumni Association," thereby dissociating itself from both the School's distinguished history and the Alumni Association's own history and causing confusion for alumni who graduated before the name change.

258. Indeed, it is possible that the Alumni Association will be unable to continue operations unless the School's name is restored.

259. Likewise, Defendants' actions have irreparably injured the Alumni Association's members by causing them to lose the prestige they would have had from being associated with Washington-Lee High School, which in turn is depriving them of invaluable educational and employment opportunities.

260. In light of the ongoing and personal nature of these injuries, monetary damages are inadequate to compensate the Alumni Association and its members.

261. These hardships to the Alumni Association and its members outweigh any hardship that an injunction would cause to Defendants, especially in light of the fact that the name change was both procedurally improper and illegal under Virginia law.

262. The public interest would be well served by a permanent injunction, as such an injunction would protect the School's numerous alumni from losing the value of the School's

reputation and prevent public confusion caused by individuals and entities being unaware that "Washington-Liberty High School" is the same institution as "Washington-Lee High School." An injunction would also serve the public interest by reversing an action that was accomplished in secret by actively deceiving the public in order to suppress public participation in government. Reversing this action would benefit the public by encouraging public officials to act honestly and transparently instead of attempting to defraud their constituents out of their civil right of public participation as Defendants have done here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter an Order ADJUDGING, ORDERING, AND DECREEING that:

a. Declaratory judgment be granted that the name change is void ab initio;

b. A permanent injunction be issued ordering that Defendants permanently recognize the School's name as "Washington-Lee High School," or, in the alternative, ordering that the purported name change be considered void and that any future attempts to change the School's name be resolved by a binding ballot referendum to the full community;

c. Plaintiff be awarded compensatory damages in an amount to be determined by the Court;

d. Plaintiff be awarded its attorneys' fees and costs; and

e. Plaintiff be awarded all such other and further relief as the Court deems proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Date: January 17, 2020                    Respectfully submitted,

                                          WASHINGTON-LEE     HIGH     SCHOOL
                                          ALUMNI ASSOCIATION, INC.

                                          By Counsel

DUNLAP BENNETT & LUDWIG PLLC


_____/s/_____
Thomas M. Dunlap (VA Bar No. 44016)
Dunlap Bennett & Ludwig PLLC
8300 Boone Boulevard, Suite 550
Vienna, Virginia 22182
(571) 252-8521 (t)
(703) 777-3656 (f)
tdunlap@dbllawyers.com

Cortland C. Putbrese (VA Bar No. 46419)
Frederick J. Poorbaugh (VA Bar No. 82527)
Dunlap Bennett & Ludwig PLLC
8003 Franklin Farms Drive, Suite 220
Richmond, Virginia 23229
(804) 977-2688 (t)
(804) 977-2680 (f)
cputbrese@dbllawyers.com
epoorbaugh@dbllawyers.com

*Counsel for Plaintiff*